# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Patterson Dental Supply, Inc., | Civ. No.: 0:19-cv-01940-JNE-LIB |
| Plaintiff, | |
| v. | **PLAINTIFF'S AMENDED COMPLAINT** |
| Daniele Pace and Henry Schein, Inc., | |
| Defendants. | |

Plaintiff Patterson Dental Supply, Inc. ("Patterson"), for its Amended Complaint against Defendants Daniele Pace ("Pace") and Henry Schein, Inc. ("Henry Schein") states and alleges as follows:

## THE PARTIES

1.      Patterson is a Minnesota business corporation with its principal place of business located at 1031 Mendota Heights Road, Saint Paul, Minnesota, 55120.  Patterson is engaged in the business of distributing supplies, equipment, and software to dental professionals across the United States.  Patterson is one of several business segments of Patterson Companies, Inc., a publicly-traded medical and veterinary supply company.

2.      Upon information and belief, Daniele Pace is an individual who resides in Peyton, Colorado.  Pace is a former employee of Patterson.  Pace consented to the jurisdiction of this Court as further set forth below.

3.      Henry Schein is a New York corporation with its principal place of business at 135 Duryea Road, Melville, NY 11747.  Henry Schein is registered with the Minnesota

Secretary of State to transact business in Minnesota.  Henry Schein is a competitor of Patterson in the distribution of supplies, equipment, and software to dental practices.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the matter in controversy exceeds the sum of $75,000.

5.      This Court has personal jurisdiction over Daniele Pace because she consented to the jurisdiction of Minnesota courts.  The contract between Patterson and Pace (the "Employee Agreement"), was fully executed by Pace.  A true and correct copy of the Employee Agreement is attached as **Exhibit 1**.  The Employee Agreement specifies that Minnesota Courts shall have exclusive jurisdiction over disputes concerning the agreement. (Compl. Ex. 1 ¶ 11.)  The Employee Agreement further states that Pace submits to personal jurisdiction in Minnesota.  (*Id.*)

6.      Daniele Pace removed this action from Minnesota state court following the filing of Plaintiff's complaint.

7.      This Court has personal jurisdiction over Henry Schein as an entity registered to do business in Minnesota.  Additionally, this Court has personal jurisdiction over Henry Schein pursuant to (without limitation) Minn. Stat. § 542.09, because Henry Schein has engaged in wrongful conduct causing injury in Minnesota.  By its wrongful and unlawful conduct, including without limitation, tortious interference with a contract that provided for adjudication of any disputes in the Courts of the State of Minnesota, Henry Schein has (or should have) anticipated and foreseen that it would be subject to suit in Minnesota.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Daniele Pace and Henry Schein are subject to personal jurisdiction in this judicial district.

## FACTUAL BACKGROUND

9.     Patterson hired Pace in June 2013 as a CEREC, later CAD/CAM, Specialist. She worked out of Patterson's Denver location and she had responsibilities throughout Colorado and portions of Wyoming.

10.     The position "CAD/CAM Specialist" previously was known as "CEREC Specialist."  This is due to the fact that, until approximately September 2017, Patterson was the exclusive distributor of a CAD/CAM product called "CEREC."  Patterson is no longer the exclusive distributor of this product.

11.     CEREC stands for Ceramic Reconstruction, a system used to design and produce certain types of dental restorations utilizing CAD/CAM technology.  CAD/CAM stands for "computer-aided design and computer-aided manufacturing" and is frequently utilized in dental restorations to design and create implants such as prostheses, crowns, bridges, and veneers.

12.     In her role at Patterson, Pace was responsible for working directly with territory sales representatives to provide specialized counseling and services to CAD/CAM customers.  She could, but was not required to, solicit her own business.  In this role, she was expected to, *inter alia*: analyze the business needs of her customers and prospects; discuss with customers and prospects the benefits and features of Patterson products; coordinate product demonstrations and installations; provide initial training and support for CAD/CAM products; be well-versed in Patterson products and services, industry

information, and competitive intelligence; and maintain accurate records for prospects, customer orders, sales records, and other financial activity.

13.     Pace voluntarily terminated her employment with Patterson on or about March 18, 2019.

14.     On information and belief, immediately upon her departure from Patterson, Pace began working for Henry Schein, Inc. ("Henry Schein"), a distributor of health care and dental products and a direct competitor of Patterson in the Colorado market and elsewhere.

15.     On information and belief, at Henry Schein, Pace holds the title, "Regional Sales Manager."

16.     Pace signed an Employee Agreement with Patterson on February 9, 2018, in exchange for valuable consideration, including not only her continued employment at Patterson, but also a $25,000 lump-sum bonus.

17.     Paragraph 2 of the Employee Agreement is entitled "Confidentiality."  In paragraph 2, Pace promised, among other things, that both during her employment and following her termination she would "keep in confidence and trust all Confidential Information, and … will not use or disclose any Confidential Information without the written consent of Patterson except as may be necessary in the ordinary course of performing my duties to Patterson."  (Ex. 1 ¶ 2.)

18.     The same paragraph defines "Confidential Information" to include "all Proprietary Information and … the confidential information of others with whom [Patterson] has a business relationship."  (*Id.*)  Proprietary Information is "information

4

having commercial value which has been developed or is possessed by [Patterson] or to which [Patterson] has rights, including . . . sales and financial reports and forecasts, cost information, confidential pricing information, … and customer and prospect information, including, without limitation, customer lists and prospect lists." (*Id.* ¶ 1(a).)

19.     Paragraph 3 of the Employee Agreement is entitled "Company Property and Return of Property."  It provides, in part:

> Company Property includes all documents, records, samples, software, products, equipment, tools and other physical property, whether or not pertaining to Proprietary Information, which are furnished to me by the Company, purchased or leased at the expense of the Company, or produced by me in connection with my employment and will be and remain the sole property of the Company.  Company Property also includes, without limitation, any electronic documents or files that contain any Proprietary Information or were produced by me in connection with my employment with the Company.  All copies of Company property are also property of the Company.  I shall return to the Company all such materials and other property as and when requested by the Company.  In any event, I shall return all such materials and other property immediately upon termination of my employment for any reason.  I shall also refrain from taking with me or otherwise retaining any such material or other property upon such termination.

(*Id.* ¶ 3.)

20.     Paragraph 3 of the Employee Agreement further provides:

> In addition, at the time of my termination, I will provide the Company with any personally-owned cell phones, laptops, computers, tablets, floppy disk, CD, DVD, zip drive, jump drive, thumb drive, memory card, memory stick or other portable hard drive or external computer information storage device that contains or could contain any Company Property, including but not limited to Confidential Information or other devices that I have used to connect to the Company's network or otherwise used for job-related purposes so that the Company may erase any Company-related information from those devices.

(*Id.*)

21.    Paragraph 4 of the Employee Agreement is entitled "Nonsolicitation."  It

provides, in part:

> (a) I acknowledge and agree that, solely due to my position with the [Patterson], I have had and will have access to certain trade secret and Confidential Information that Company has developed and shall continue to develop through the Company's efforts and at the Company's cost, including customer lists, which are proprietary to the Company.
>
> (b) During the period of my employment and for one (1) year after the termination of such employment (regardless of whether such termination is voluntary or involuntary), I shall not, directly or indirectly, on behalf of myself or any other person or entity other than the Company:
>
>> (i) Use any of the Company's trade secrets, including its customer lists, to divert or solicit business from any Customer of the Company that was: (A) solicited directly by me or to whom I directly provided Services; or (B) whose solicitation or receipt of Services were directly or indirectly, in whole or in part, supervised by me; or
>>
>> (ii) Use any of the Company's trade secrets to interfere in any way, or attempt to interfere, with the Company's relationships with any of its Suppliers [.]

(*Id.* ¶ 4.)

22.    Paragraph 5 of the Employee Agreement is entitled "Mobile Devices."  It

provides, in part:

> I understand that the Company may permit me to connect to the Company's network for the performance of my job [with] a personally-owned cell phone, laptop, computer, tablet, floppy disk, CD, DVD, zip drive, jump drive, thumb drive, memory card, memory stick or other portable hard drive or external computer information storage device that contains or could contain any Company Property, including but not limited to Confidential Information or other mobile

device ("Mobile Device"). To the extent I use a Mobile Device to connect to the Company's network, I agree to the following rules:

(a) All employment policies of the Company apply to the use of Mobile Devices connected to the Company's network.

(b) All Company-related information residing on a Mobile Device belongs to the Company and may only be used for activities related to my job responsibilities.

(c) Mobile Devices connected to the Company's network are subject to monitoring by the Company at any time, and I will have no expectation of privacy in any files or messages sent, stored, created or received on a Mobile Device connected to the Company's network. The Company may disconnect my Mobile Device from the Company's network at any time, with or without notice.

(d) I agree to provide the Company with access to any Mobile Device owned by me and connected to the Company's network, used for Company business, or used to store Company Property, including but not limited to Confidential Information upon the Company's request. For example, in the event of a suspected incident, data breach, or policy violation associated with a Mobile Device, it may be necessary for the Company to access data on the device. I agree not to delete such data prior to facilitating the Company's access to the Mobile Device.

(e) For a period of one year following my departure from Patterson, I agree to provide the Company or its designated representative, at the Company's request, with access to any Mobile Device owned by me and connected to the Company's network, used for Company business, or used to store Company Property, including but not limited to Confidential Information at any time (including but not limited to any floppy disk, CD, DVD, zip drive, jump drive, thumb drive, memory card, memory stick or other portable hard drive or external computer information storage device that contains or could contain any Company Property, including but not limited to Confidential Information) so that the Company or its designated representative may make a forensic image and determine whether any Company information remains on any such devices. All Company information will be removed.

(*Id.* ¶ 5.)

23.     Paragraph 7 of the Employee Agreement is entitled "Notification."   It

provides, in part:

> In the event that I obtain new employment within one (1) year after
> the termination of my employment with Patterson, I agree that I shall:
> (i) disclose this Agreement to my new employer prior to beginning
> the employment; and (ii) notify Patterson of the identity of my new
> employer within seven (7) days after accepting any offer of
> employment by sending a written notification to Patterson.

(*Id.* ¶ 7.)

24.     Pace agreed that "it would be difficult to measure any damages to [Patterson]

that might result from [her] breach" of the Employee Agreement and, "that in any event

monetary damages would be an inadequate remedy for any such breach."   She agreed,

further, that should she breach any portion of the Employee Agreement, Patterson "shall

be entitled to . . . temporary and permanent injunctive relief."  (*Id.* ¶ 8.)

25.     Pace's Employee Agreement is the type of agreement that companies

commonly enter into to protect their trade secrets and their confidential information,

including technology and software, sales strategy, pricing information, and customer lists

(among other valuable information).

26.     Pace signed a similar agreement with Henry Schein.  Henry Schein requires

its employees, including Pace, to sign such agreements and  has taken legal action to

enforce these contracts in the past.

27.     At least as early as July 2018, Pace was in contact with Henry Schein to discuss potential employment, and terms of that employment, with Henry Schein.   On information and belief, that contact was initiated by Henry Schein.

28.     During and after the period encompassing Henry Schein's recruitment of Pace (July 2018 until March 2019), Henry Schein was aware of the following facts: Pace's salary and benefits at Patterson; Pace's customers and the nature of her sales to those customers (including specific products sold, and when); the existence and contents of Pace's Employee Agreement; Pace's specific plans to resign from Patterson.

29.     On information and belief, Henry Schein offered Pace exorbitant and unreasonably high compensation and benefits.

30.     On information and belief, Henry Schein agreed to bear or reimburse any costs Pace may incur associated with legal actions by Patterson to enforce its contract with Pace (such as this action) and/or other claims for Pace's wrongful conduct.

31.     On or about March 18, 2019, Pace terminated her employment with Patterson. She immediately thereafter took a job with Henry Schein as Regional Sales Manager in the Denver market.

32.     Just ten days prior to her departure from Patterson, on March 8, 2019, Pace forwarded three emails to her personal email account containing all of her business contacts from her employment at Patterson.

33.     There is no valid business reason for Pace to have forwarded Patterson Confidential Information to her personal email account.   She had the ability to access her business email account from her personal mobile device.

34.     On or about March 19, 2019,  an HR Operations Coordinator for Patterson's parent company sent a letter to Pace reminding her of the obligations contained in the Employee Agreement and that such obligations continued after her employment at Patterson ended.

35.     On the same date, the same HR Operations Coordinator sent a letter to Lorelei McGlynn, Senior Vice President and Chief Human Resources Officer for Henry Schein, informing McGlynn of Pace's obligations under her Employee Agreement with Patterson, including, but not limited to, the nonsolicitation provisions contained at Paragraph 4.

36.     By no later than April 24, 2019, Pace had called on at least one Patterson customer in her capacity as Regional Sales Manager for Henry Schein.

37.     On information and belief, Pace called on an existing Patterson customer in Colorado Springs on or about April 23, 2019, and invited this customer to attend a Henry Schein CEREC event on April 24, 2019.

38.     Pace assembled a sales quote for this customer as recently as one week prior to her departure from Patterson.

39.     Since Pace's departure, the customer has not purchased any products or services from Patterson.

40.     On information and belief, Pace is actively soliciting other Patterson customers to move their business to Henry Schein.  Another customer has cancelled a previously scheduled demonstration with Patterson due to Pace's solicitation efforts on behalf of Henry Schein.

41.     During the period of her employment at Patterson, from at least December 2016 through March 8, 2019, Pace forwarded approximately forty work-related emails from her Patterson email address to her personal email address.  These emails and their attachments included Patterson sales quotes, customer contracts, email correspondence with customers, customer lists, sales reports, and Pace's business contacts.

42.     Many, if not all, of the Patterson documents that Pace forwarded to her personal email account are highly sensitive and constitute Patterson's Confidential Information.  (Ex. 1 ¶ 1(a).)  The documents include, without limitation: customer lists (with contact information); customer and prospect information; confidential pricing information; and marketing plans and strategies.

43.     By way of illustrative example only, on January 5, 2017, Pace forwarded to her personal email account an Excel spreadsheet entitled "CEREC Owners 07 27 15" containing detailed information (including contact and sales information) for approximately 700 Patterson customers who own the proprietary CEREC technology.

44.     Documents of the type that Pace forwarded to her personal email address— and the very documents that she did, in fact, send—are of great commercial value to Patterson.  Patterson's ability to compete in the marketplace, to sell its products at the most advantageous margins to its dental-practice customers, depends upon its ability to closely guard its commercial contracts, pricing agreements, and customer and prospect lists.

45.     Patterson does, in fact, closely guard its Confidential Information, including many of the documents that Pace forwarded to her personal email account.  For example, Patterson's Employee Handbook, which all employees receive, protects Confidential

Information by prohibiting employees from removing from Patterson premises, copying, transmitting, or using any such information for any purpose outside of their Patterson employment.

46.     Patterson's Employee Handbook also prohibits employees from revealing any Confidential Information to non-Patterson persons without authorization from their manager.  Employees also are required by the Employee Handbook to store information in a manner that prevents unauthorized parties from accessing or viewing them, install security software, and use encryption on all devices.

47.     Pace's current employer, Henry Schein, is in possession of the Employee Agreement.

48.     Pace has not returned Patterson Confidential Information in her possession, as required by the Employee Agreement.

49.     Pace has refused to confirm in writing that she has complied and will continue to comply with her Employee Agreement, as requested by the undersigned counsel for Patterson on several occasions.

50.     Pace's counsel has refused to agree to provide Patterson with appropriate access to Pace's Mobile Devices for review and forensic imaging, as required by the Employee Agreement.

51.     On information and belief, in-house and outside counsel for Henry Schein are coordinating with counsel of record for Pace in the defense against this action.

52.     For example, Henry Schein recommended that counsel of record for Pace engage a particular document review vendor in this matter.  In addition, Pace's Rule

26(a)(1) Initial Disclosures reference individuals with knowledge of facts relevant to this case that must be contacted through Henry Schein's legal counsel.

53.     Further, Henry Schein's responses to a third party subpoena issued by Patterson in this action, as well as a privilege log submitted in conjunction with its response, reference its assertion of the attorney-client privilege and work product doctrines in connection with Patterson's claims against Pace. The privilege log and response assert these privileges and doctrines over communications and documents generated as early as May 17, 2019, when counsel for Patterson sent a letter to Pace regarding her obligations under the Employee Agreement.

**CAUSES OF ACTION**

**COUNT I**
**BREACH OF CONTRACT**
**(Against Daniele Pace)**

54.     Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

55.     The Employee Agreement is a valid and binding contract supported by valuable consideration.

56.     The restrictive covenants outlined in the Employee Agreement are valid protections of Patterson's trade secrets, including, without limitation, pricing and financial information and customer contact information.

57.     The restrictive covenants contained in the Employee Agreement are reasonable in duration and geographic scope.

58.     Patterson has performed all of the terms and conditions required of it under the Employee Agreement, including but not limited to, payment of the agreed-upon signing bonus.

59.     Pace has breached the Employee Agreement in a number of ways, including, but not limited to, breaching the confidentiality provisions, the return of property provisions, the mobile property provisions, and the non-solicitation provisions.

60.     Pace has indicated, through her actions, that she intends to continue breaching her contractual obligations to Patterson.

61.     As a direct and proximate result of Pace's breach of her agreement with Patterson, Patterson has been harmed and will continue to be harmed.

62.     Pace's breach and future breaches of her contractual obligations to Patterson subjects Patterson to great risk of immediate and irreparable harm for which no remedy at law will be adequate.   Consequently, Patterson is entitled to temporary and permanent injunctive relief preventing further breaches of the Employee Agreement.

## COUNT II
## MISAPPROPRIATION OF TRADE SECRETS
### (Against All Defendants)

63.     Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

64.     Patterson maintains certain trade secret information as part of its business to provide it with a competitive advantage.

14

65.    These trade secrets include, without limitation, confidential business and financial information, customer information and lists, and other confidential and valuable information.

66.    Patterson undertook reasonable measures to maintain the secrecy of its trade secret information and prevent it from becoming available to other persons.   These measures include, without limitation, employment agreements with confidentiality provisions, such as the Employee Agreement signed by Pace, provisions in its Employee Handbook, and restricted access to its facilities.

67.    Patterson's trade secret information derives independent economic value from not being generally known to, and not readily ascertainable by, Patterson's competitors and others who could obtain economic value from its use.

68.    Patterson has expended significant time and financial resources in developing its trade secret information.

69.    Pace had a duty to maintain the secrecy of Patterson's Confidential Information and return the information upon the termination of her employment with Patterson.

70.    Henry Schein was aware of Pace's Employee Agreement and Pace's accompanying duty to maintain the secrecy of Patterson's Confidential Information.

71.    Pace was acting as an employee and agent of Henry Schein, in the scope of her employment and for the benefit of Henry Schein, when she misappropriated Patterson's trade secrets.   Henry Schein therefore is also liable for misappropriation of Patterson's trade secrets.

15

72.     In violation of this duty, on information and belief, Pace has misappropriated Patterson's trade secrets by, among other things, retaining such trade secret information without authorization and using and disclosing Patterson's trade secret information to solicit Patterson customers and misappropriate Patterson's business for her own personal benefit and the benefit of Henry Schein.

73.     On information and belief, Henry Schein also has wrongfully acquired, retained, disclosed, and/or used Patterson's trade secret information, including (without limitation) by retaining trade secret information provided to it by Pace without authorization and using and disclosing Patterson's trade secret information to solicit Patterson customers and misappropriate Patterson's business for its own benefit.

74.     Pace had reason to know at the time of her misappropriation, use, and disclosure of Patterson's trade secret information that she had acquired it in a manner giving rise to a duty to maintain its secrecy and limit its use.

75.     Henry Schein had reason to know at the time of its misappropriation, use, and disclosure of Patterson's trade secret information that Pace had acquired it in a manner giving rise to a duty to maintain its secrecy and limit its use.

76.     As a direct and proximate result of Pace's and Henry Schein's misappropriation, Patterson has suffered recoverable harm.

77.     Pace and Henry Schein maliciously misappropriated Patterson's trade secrets with willful and wanton disregard of Patterson's rights, and Patterson is entitled to recover its attorneys' fees, costs, and exemplary damages.

78.     Pace's and Henry Schein's misappropriation subjects Patterson to great risk of immediate and irreparable harm for which no remedy at law will be adequate. Consequently, Patterson is entitled to temporary and permanent injunctive relief prohibiting Pace and Henry Schein from further misappropriation of its trade secrets.

**COUNT III**
**CONVERSION**
**(Against Daniele Pace)**

79.     Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

80.     Patterson is the owner of certain property currently in Pace's possession. This property includes, without limitation, emails and documents she sent from her Patterson email account to her personal email account from December 2016 through at least March 8, 2019.

81.     Pace knowingly retained this property during and following her employment with Patterson without Patterson's authorization.

82.     Pace did not return such property immediately upon termination of her employment, as required under the Employee Agreement.

83.     Pace refused to return such property at Patterson's request.

84.     Patterson is entitled to return of its property.

85.     Patterson has suffered economic damages as a result of Pace's conversion of its property.  Consequently, Patterson is entitled to an award of damages, including interest and the costs of recovering the property.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**
**(Against All Defendants)**

86.     Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

87.     Patterson has a valid and enforceable contract with Pace in the form of her Employee Agreement, which, among other things, obliges her to make her electronic devices available for inspection by Patterson, to refrain from retaining, using and/or disclosing Patterson's Confidential Information and trade secret information, to refrain from using and/or disclosing Patterson's trade secret information to solicit Patterson customers, and to refrain from misappropriating Patterson's business for the benefit of Henry Schein.

88.     At all relevant times, Henry Schein had knowledge of Patterson's contractual relationship and contract with Pace.

89.     Henry Schein has intentionally and wrongfully interfered with Patterson's contractual relationship and contract with Pace without justification.

90.     Patterson has and had valid and enforceable contracts with its customers for whom it provides dental supplies, equipment, and software.

91.     At all relevant times, Pace and Henry Schein had knowledge of Patterson's contractual relationships and contracts with Patterson's customers for whom Patterson provides dental supplies, equipment, and software.

92.     Pace and Henry Schein have intentionally and wrongfully interfered with Patterson's contractual relationships and contracts with Patterson's customers for whom Patterson provides dental supplies, equipment, and software without justification.

93.     As a direct and proximate result of Pace's and Henry Schein's tortious interference with Patterson's valid and enforceable contracts, Patterson has suffered and continues to suffer immediate and irreparable injury, loss, harm, or damage, and will continue to suffer said injury, loss, harm, or damage unless and until Pace and Henry Schein are restrained from their present conduct, tortious.

94.     As a direct and proximate result of Pace's and Henry Schein's tortious interference with Patterson's valid and enforceable contracts, Patterson has suffered additional damages, which continue to accrue, including, without limitation, attorney's fees and costs and lost business and profits.

**COUNT V**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC**
**ADVANTAGE**
**(Against All Defendants)**

95.     Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

96.     Patterson has now and has had in the past a reasonable expectation that it would to do business with certain persons and entities for Patterson's economic advantage. Such persons and entities include, but are not limited to: (a) the customers listed on the "CEREC Owners 07 27 15" spreadsheet that Pace wrongfully took from Patterson and the contents of which were, on information and belief, provided to Henry Schein and various

Henry Schein employees; (b) all customers and prospective customers with which Pace interacted or was involved with during her tenure at Patterson.

97.     Patterson had a reasonable expectation that it would do business with these persons and entities for a variety of reasons, including, without limitation, the facts that: (a) Patterson had done business some of these persons and entities in the past; (b) such persons and entities came back to Patterson to request similar products and services from Patterson; (c) such persons and entities were pleased with the quality of services and products they received from or were offered by Patterson, including the ability of Patterson to help such persons and entities improve their dental practices; (d) such persons and entities, in some instances, did not stop doing business with Patterson until Pace's departure to Henry Schein and because of Pace's and Henry Schein's wrongful actions to usurp Patterson's business with these customers; (e) such entities stated that they were favorably impressed with the products and services Patterson offered and the pricing at which such products and services were offered; and/or (f) Paterson's past success in winning business and establishing contractual relationships under similar circumstances show that it was likely Patterson would obtain new business and establish new contractual relationships with these persons and entities.

98.     Pace and Henry Schein knew of Patterson's reasonable expectation of economic advantage with these persons and entities.

99.     Pace and Henry Schein acted intentionally and wrongfully to interfere with Patterson's reasonable expectation of continuing, ongoing business with these persons and entities and the economic advantage that such business provided to Patterson.

100.   Pace and Henry Schein were not justified in interfering with Patterson's business and reasonable expectation of economic advantage with these persons and entities.

101.   In the absence of the wrongful conduct of Pace and Henry Schein, it is reasonably probable that Patterson would have realized greater economic advantage from its relationships with these persons and entities.  In the past year alone, Pace and Henry Schein actually caused certain of these persons and entities to enter into business transactions with Henry Schein rather than Patterson.  But for the wrongful conduct of Pace and Henry Schein, those persons and entities would have engaged in such business with Patterson and Patterson would have reaped the economic advantage of such business and relationships.  Instead, Pace and Henry Schein wrongfully obtained such economic advantage for themselves, and therefore unjustly enriched themselves and harmed Patterson.

102.   Patterson has been harmed as a direct and proximate result of Pace's and Henry Schein's intentional and wrongful interference with Patterson's business and reasonable expectation of economic advantage with these customers and will continue to suffer irreparable injury, loss, harm, and damage, unless and until Pace and Henry Schein are restrained from further wrongful conduct.

103.   As a direct and proximate result of Pace's and Henry Schein's intentional interference with Patterson's business and reasonable expectation of economic advantage with these persons and entities, Patterson has suffered additional damages, which continue to accrue, including, without limitation, attorney's fees and costs and lost business and profits.

## COUNT VI
## BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
**(Against Pace)**

104.    Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

105.    Pace owed Patterson a fiduciary duty and duty of loyalty to guard and not to use or disclose Patterson's confidential information and trade secrets except for the sole benefit of Patterson.

106.    On information and belief, Pace breached her fiduciary duty and duty of loyalty by, among other things, accessing Patterson's confidential and proprietary information and trade secrets while still employed with Patterson with the intent and purpose of using and disclosing such information for her personal benefit and for the benefit of Henry Schein.

107.    Pace breached her fiduciary duty and duty of loyalty by, among other things, failing to return to Patterson its property, information, and data before her employment ended, instead, on information and belief, secretly keeping such materials for her own use and benefit and for the use and benefit of Henry Schein.

108.    Under the circumstances present in this case, Pace's fiduciary duty and duty of loyalty in certain relevant respects continued after the last date of her employment with Patterson.

109.    Pace knew or should have known the confidential and proprietary nature of Patterson's property, information, and documents.

110.    Upon information and belief, Pace has use and/or disclosed Patterson's property, information, and documents for her personal benefit and the benefit of Henry Schein.

111.    As a direct and proximate result of Pace's actions in breach of her obligations and duties to Patterson, Patterson has suffered and will continue to suffer immediate and irreparable injury, loss, harm, or damage, unless and until Pace is restrained from her present conduct.

112.    As a direct and proximate result of Pace's actions in breach of her obligations and duties to Patterson, Patterson has suffered additional damages, which continue to accrue, including, without limitation, attorney's fees and costs and lost business and profits.

## COUNT VII
## INDUCING, AIDING, AND ABETTING BREACHES
### (Against Henry Schein)

113.    Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

114.    On information and belief, Henry Schein induced, aided, and abetted Pace to engage in conduct that it knew constituted a breach of her fiduciary duties and duty of loyalty to Patterson.

115.    As a direct and proximate result of Henry Schein's actions in aiding, inducing, and abetting Pace's breach of her obligations and duties to Patterson, Patterson has suffered and will continue to suffer immediate and irreparable injury, loss, harm, or damage, unless and until Henry Schein is restrained from its present conduct.

116.    As a direct and proximate result of Henry Schein's actions in aiding, inducing, and abetting Pace's breach of her obligations and duties to Patterson, Patterson has suffered additional damages, which continue to accrue, including, without limitation, attorney's fees and costs and lost business and profits.

**COUNT VIII**
**CONSPIRACY**
**(Against All Defendants)**

117.    Patterson restates and re-alleges the preceding paragraphs as if fully set forth herein.

118.    Through their actions as set forth above, Defendants have combined among themselves to accomplish unlawful purposes and/or accomplish lawful purposes through unlawful means.

119.    The actions of Defendants constitute conspiracy in violation of the law.

120.    As co-conspirators, Pace and Henry Schein are jointly and severally liable for the actions of each other.

121.    As a direct and proximate result of Defendants' actions, Patterson has suffered and will continue to suffer immediate and irreparable injury, loss, harm, or damage, unless and until Defendants are restrained from their present conduct.

122.    As a direct and proximate result of Defendants' actions, Patterson has suffered additional damages, which continue to accrue, including, without limitation, attorney's fees and costs and lost business and profits.

**WHEREFORE**, Plaintiff respects that this Court enter a judgment in its favor and against Defendants as follows:

1.      A temporary injunction and permanent injunction, enjoining and restraining Defendants from further activities in violation of contractual, statutory, common law, and fiduciary obligations and duties to Patterson, including (i) enforcing Pace's Employee Agreement with Patterson, (ii) prohibiting further retention, use, disclosure, and/or misappropriation of Plaintiff's property, confidential information and/or trade secrets, and (iii) requiring Pace to make her devices available for inspection.

2.      An order requiring Defendants to comply with Daniele Pace's obligations under the Employee Agreement she entered into with Patterson and which she signed on February 9, 2018, including, without limitation, the non-solicitation provisions;

3.      An order requiring Defendants to return all property, including electronically stored data and files owned by Patterson;

4.      An order requiring Defendant Daniele Pace to provide all Mobile Devices (as that term is defined in the Employee Agreement) for forensic examination and imaging;

5.      Damages, including exemplary damages, in an amount to be established at trial;

6.      Costs, expenses, and attorneys' fees as otherwise allowed by law; and

7.      Any other appropriate relief as may be available under the law and that this Court deems just and equitable.

Dated: December 20, 2019

**JONES DAY**

By: */s/ Joseph W. Hammell*

Joseph W. Hammell (MN No. 0172698)
jhammell@jonesday.com
Kristin K. Zinsmaster (MN No. 0391299)
kzinsmaster@jonesday.com
90 South 7th Street, Suite 4950
Minneapolis, MN 55402
(612) 217-8800

*Attorneys for Plaintiff*